UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

United States of America,

              Plaintiff,

v.

Carlota Ponce,

              Defendant.

Crim. No. 12-115(3) (JRT/LIB)

**REPORT AND RECOMMENDATION**

---

       This matter came before the undersigned United States Magistrate Judge upon Defendant's motion to suppress evidence obtained as a result of several searches and motion to suppress statements made by Defendant.  The matter has been referred to the Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1.  The Court held an evidentiary hearing on November 26, 2012 regarding the suppression motions and both parties' discovery motions in this case.[1]  For the reasons outlined below, the Court recommends that Defendant's motions to suppress be denied.

## I.      BACKGROUND

       This case arises out of an alleged drug conspiracy in the Twin Cities, Minnesota area as part of which Defendant is alleged to have participated.  The additional facts relevant to this case are described below in discussing each of the search warrants challenged by Defendant.

## II.     DISCUSSION

       Although Defendant's written submission did not provide any challenges to any specific searches or any specific issues upon which Defendant sought to suppress any statements she made, at the hearing, Defendant and the Government provided that the search warrants and

---

[1] The discovery motions were the subject of a separate Order.

supporting affidavits for the searches of Defendant's house, vehicle, her person, and the application for the mobile tracking device of her vehicle are being submitted, on the four-corners of the documents, to the Court as exhibits for a determination of whether they are supported by probable cause. Defendant also submitted to the Court the recording and transcript of the Miranda warning provided to her during an interview, for a determination of whether the warning she was provided violates any of the principles of the United States Constitution. At the hearing, aside from clarifying the specific legal issues that were disputed, the parties did not offer any additional arguments. The Court addresses each of Defendant's challenges in turn.

### A. The search warrants pertaining to Defendant's residence, vehicle, and person

#### 1) Facts included in the affidavit in support of the search warrants[2]

Hennepin County Sheriff's Office Deputy Anthony Fletcher (Deputy Fletcher), the affiant for all three search warrant applications, provided the following information in support of the search warrants. (See Gov't Ex. 2).

Nine months prior to the application of the search warrant made on January 26, 2012, Deputy Fletcher began communicating with a confidential informant (CI) who provided information "about a group of persons the [CI] knew . . . were distributing large quantities of crystal methamphetamine in the Twin Cities area." He provided that the group of persons he was describing "utilized a house located at 7017 River Road, Otsego" ("7017 River Road residence") for their drug dealing activities. The CI explained to Deputy Fletcher that a Hispanic male identified as "Pelon" "controlled large shipments of narcotics into the Twin Cities area" and would sell and deal large quantities of methamphetamine in the Twin Cities area. The CI

---

[2] Although there were three separate applications for search warrants of Defendant's vehicle, residence, and person, the same affidavit (with the exception of the last paragraph in each describing what was to be searched) was submitted in support of all three search warrants. As such, the Court summarizes all facts for all three search warrants and finds that all the facts described within this section are relevant to the probable cause determination for each of the search warrants.

stated that "Pelon" had offered to sell the CI, as much methamphetamine as the CI wanted. The CI was able to describe "Pelon's" appearance, height, weight, and the cell-phone number that "Pelon" used.[3]

Deputy Fletcher further explained that in the three months prior to his application for the search warrant, law enforcement had placed electronic surveillance on a vehicle used by "Pelon."[4] During the four months prior to the search warrant application, law enforcement, using the CI, purchased large quantities of crystal methamphetamine from Blanco (Pelon). During one of the purchases, Blanco "sent a runner that came directly from 7017 River Road NE, Otsego." After leaving the 7017 River Road residence, the runner met with the CI at a pre-determined location and exchanged a quantity of crystal methamphetamine[5] for pre-marked currency.

In the month prior to the application for the search warrant, law enforcement, while driving past the 7017 River Road residence, observed a gray 2005 Chrysler Pacifica with Minnesota license plate number 193 HGV ("Chrysler Pacifica") parked in the driveway. They discovered that the vehicle was registered to Defendant, whose address was listed as 3144 Georgia Avenue North, Crystal ("3144 Georgia Avenue residence"). In the ten-days prior to the search warrant application, Deputy Fletcher also drove past the 3144 Georgia residence and observed the Chrysler Pacifica parked in the driveway on more than one occasion.

During surveillance, Deputy Fletcher observed a Hispanic female matching Defendant's description driving the Chrysler Pacifica while Blanco was riding in the passenger seat. After

---

[3] Deputy Fletcher additionally described in his affidavit that the CI had previously provided law enforcement with information that they found to be true and correct and that the information provided by the CI on previous occasions had led to seizures of large quantities of narcotics, U.S. currency, firearms, and multiple arrests and convictions of narcotics traffickers in both State and Federal court.
[4] Although the officers initially merely knew that a person matching "Pelon's" description was driving the vehicle, after officers performed a traffic stop on the individual driving the vehicle, they confirmed with the CI that the individual driving the vehicle was, in fact, "Pelon," who was then identified as Efrain Mercado Blanco.
[5] The substance was tested after the exchange and confirmed to contain methamphetamine.

speaking to the CI, Deputy Fletcher then learned that "Blanco had a female friend who drove a gray Chrysler SUV and that sometimes this female would accompany Blanco and assist him when he was delivering narcotics to customers." Based on this information, it was Deputy Fletcher's belief that the vehicle parked at the 7017 River Road residence belonged to Defendant.

In the seventy-two hours before the application for the search warrant, law enforcement made a plan for a controlled purchase from Blanco. Prior to making the call to purchase crystal methamphetamine from Blanco, law enforcement placed surveillance officers at both the 7017 River Road residence and the 3144 Georgia Avenue residence. Deputy Fletcher then met with the CI and directed the CI to place a call to Blanco for a pre-specified quantity of crystal methamphetamine. After the call, the CI explained to Deputy Fletcher that Blanco agreed to sell to the CI the amount of crystal methamphetamine requested at a pre-determined meet location. Law enforcement surveillance was then established at the pre-determined meet location.

Shortly after the call concluded, officers observed a female matching the description of Defendant exit the front door of the 3144 Georgia Avenue residence and enter the driver's seat of the Chrysler Pacifica. The vehicle then left and continued to be under surveillance until it arrived at the 7017 River Road residence. The surveillance officers then observed a Hispanic male matching the description of Blanco depart from the 7017 River Road residence in the passenger seat of the Chrysler Pacifica. Surveillance officers then continued to follow the Chrysler Pacifica, Defendant, and Blanco until the vehicle arrived at the pre-determined meet location, where Blanco exited the Chrysler Pacifica and entered the CI's vehicle.

Prior to directing the CI to the pre-determined meet location, Deputy Fletcher searched the CI for any contraband and found none. Shortly after Blanco exited the CI's vehicle, Blanco

and Defendant left the area, at which time Deputy Fletcher met with the CI who provided Deputy Fletcher a quantity of crystal methamphetamine that later tested positive for methamphetamine. The CI informed Deputy Fletcher that Blanco was the person in his vehicle who sold him the crystal methamphetamine. The CI also stated that Blanco offered to sell him additional "pound quantities of crystal methamphetamine." While Deputy Fletcher was talking to the CI, officers observed Blanco and Defendant, in the Chrysler Pacifica, return to the 7017 River Road residence where they both entered through the south door.

Also in the seventy-two hours before Deputy Fletcher applied for the search warrant, the CI informed Deputy Fletcher that he or she had received phone call from Blanco requesting a meeting. Deputy Fletcher followed the CI to the place of the meeting, at which Blanco arrived in the Chrysler Pacifica being driven by a Hispanic female matching Defendant's description. After the meeting, Deputy Fletcher met with the CI who advised him that Blanco had informed the CI that he was "expecting a large shipment of crystal methamphetamine in the next day" and had also offered to sell the CI "whatever quantities of narcotics" the CI wanted in exchange for $16,000 per pound.

Based on this information, Deputy Fletcher believed that the gray 2005 Chrysler Pacifica with Minnesota license plate number 193 HGV was "involved in the trafficking of large quantities of crystal methamphetamine."

## 2) The search warrants for Defendant's residence, vehicle, and person are supported by probable cause

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. It further provides that "no warrants shall issue, but upon probable cause, supported by Oath or

affirmation." Id. As explained previously by the Eighth Circuit, "[a]n affidavit for a search warrant need only show facts sufficient to support a finding of probable cause." United States v. Parker, 836 F.2d 1080, 1083 (8th Cir. 1987). Probable cause exists when "a practical, common-sense" evaluation of "all the circumstances set forth in the affidavit," demonstrate "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Gates, 462 U.S. at 231). "The existence of probable cause depends on whether, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (internal quotation marks omitted).

The sufficiency of a search-warrant affidavit is examined using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (internal quotation marks omitted). "Therefore, when the issuing judge relied solely upon the supporting affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." United States v. Wiley, No. 09-CR-239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (internal quotation marks omitted). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)). Nevertheless, "[a] magistrate's determination of probable cause should be paid great deference by reviewing courts," and "the duty of a reviewing court is simply to ensure that the magistrate

had a 'substantial basis for concluding' that probable cause existed." <u>Gates</u>, 462 U.S. at 236, 238-39 (quoting <u>Jones v. United States</u>, 362 U.S. 257, 271 (1960)).

Before addressing the issue of probable cause as to each of the search warrants, the Court first addresses the issue of the confidential informant.

"When a confidential informant provides information in support of a search warrant, the issuing magistrate considers the informant's reliability and the basis of his knowledge." <u>United States v. Butler</u>, 594 F.3d 955, 962 (8th Cir. 2010). However, the law does not require that every statement made by the CI be supported by corroborating evidence. <u>See id.</u> ("The totality of the circumstances analysis applicable to probable cause determinations, however, does not mandate that both factors be present before a warrant may issue."); <u>United States v. Harris</u>, 557 F.3d 938, 940-41 (8th Cir. 2009) (affirming a denial of Defendant's motion to suppress and explaining that "[a]n informant is sufficiently reliable if the informant has provided reliable information in the past **or** if details from the informant are independently corroborated." (emphasis added)); <u>United States v. Stearn</u>, 597 F.3d 540, 555 (3rd Cir. 2010) ("A magistrate may issue a warrant relying primarily or in part upon the statements of a confidential informant, so long as the totality of the circumstances gives rise to probable cause."). Analyzing the United States Supreme Court's decision in <u>Illinois v. Gates</u>, 462 U.S. 213 (1983), the court in <u>Stearn</u> explained that "a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability" and "police corroboration of details of an informant's tip" [is] an important method for establishing a tip's reliability." 597 F.3d at 555 (internal quotation marks omitted).

Defendant has not challenged the reliability of the CI, and in light of the numerous instances in which the police corroborated information provided by the CI (such as the fact that

the 7071 River Road residence was used for drug dealing activities and that Blanco was driven to drug deliveries by a female in a gray Chrysler SUV), as well as his participation in controlled purchases and the previous occasions on which he provided information to the police leading to arrests and searches, the Court finds the CI to be reliable.  See United States v. Webster, 625 F.3d 439, 443-44 (8th Cir. 2010) (finding an informant reliable when the informant had successfully completed two prior controlled buys); United States v. Buchanan, 574 F.3d 554, 562 (8th Cir. 2009) (explaining that "[a]n informant may also be considered reliable if the information he or she supplies 'is at least partially corroborated' by other sources" and that "[e]ven the corroboration of minor, innocent details can suffice to establish probable cause"); United States v. Lucca, 377 F.3d 927, 933 (explaining that an "informant's track record of reliability [can be] established by successful controlled purchases of crack cocaine").  .

As to the determination of probable cause for the search warrant of the vehicle, based on the information included in the affidavit in support of the search warrant to search Defendant's vehicle (the gray 2005 Chrysler Pacifica with Minnesota license plate number 193 HGV) there is ample evidence to conclude that probable cause existed for the issuance of the search warrant. During their investigation, officers themselves, on at least one occasion, observed Defendant driving the Chrysler Pacifica during a controlled purchase operation, during which Blanco was seated in the passenger seat and made a sale of methamphetamine to the CI.  Police also observed Blanco, a person police had corroborated evidence was a drug dealer, riding in the Chrysler Pacifica on other occasions as well.  In particular, Defendant was also seen driving Blanco in the Chrysler Pacifica to a meeting with the CI during which Blanco offered to sell more methamphetamine to the CI.  Officers themselves had observed, on numerous occasions, the Chrysler Pacifica parked in the driveway of the house that the police had observed a "runner"

leave during a controlled purchase and which the CI had identified as a place used by Blanco and others for drug dealing activities. The CI had also provided that Blanco was often driven by a female in a Chrysler SUV to and from drug deliveries.

The Court finds that there was a substantial basis for concluding that probable cause existed that the controlled substances listed in the search warrant application would be found within the gray 2005 Chrysler Pacifica with Minnesota license plate number 193 HGV. See United States v. Evans, 271 Fed. Appx. 236, 237 (3d Cir. 2008) (finding that probable cause supported a search warrant for a vehicle that the police had observed being used in three drug transactions); United States v. Howard, 368 Fed. Appx. 892, 894-95 (10th Cir. 2010) (finding that probable cause supported a warrant for the search of the defendant's vehicle in part because police had information that the vehicle was involved in a previous drug transaction, the defendant were believed to have been involved in "drug-related conduct," and the defendant was expecting a large shipment of drugs); United States v. Hinton, 2009 WL 2928313, at *11 (E.D. Mo. Sept. 9, 2009) (finding that probable cause supported the issuance of a search warrant for a residence and vehicle, which was believed to have been involved in drug trafficking); United States v. Williams, No. 06-CR-208 (JMR/JJG), 2006 WL 2864099, at *4 (D. Minn. Oct. 2, 2006) (finding that probable cause supported a warrantless search of the vehicle and explaining that "[w]here a suspect drives a vehicle to the site of an expected drug transaction, for the purpose of selling drugs at that site, officers have probable cause to search the vehicle for drugs").

Based on the facts described above, and for the same reasons, the Court also believes that there was substantial basis to conclude that probable cause existed to believe that controlled substances listed in the search warrant applications would be found at the 3144 Georgia Avenue residence as well as on Defendant's person. See United States v. Garcia-Hernandez, 682 F.3d

767, 771 (8th Cir. 2012) (affirming a finding that a search warrant for the search of the defendant's residence was supported by probable cause, in part, because "[t]he affidavit accompanying the warrant application stated that vehicles belonging to [the defendant] were seen coming and going from residences associated with drug distribution, and cars of known drug dealers were seen coming and going from [the defendant's] house."); Ford v. United States, 2012 WL 955334, at *7 (E.D. Mo. Mar. 21, 2012) (finding that a challenge to probable cause would have been without merit because "police surveillance of [the defendant's] residence corroborated statements from the confidential source that [the defendant] was dealing drugs from his apartment, such that there was probable cause to issue the search warrant"). Not only was there reliable information, and observations by the police themselves, that Defendant was acting as a driver for Blanco during drug dealing transactions, but officers had also witnessed the Chrysler Pacifica at issue parked, numerous times, at the 3144 Georgia Avenue residence, and witnessed Defendant leave the 3144 Georgia Avenue residence almost immediately after they had arranged for a controlled purchase of methamphetamine with Blanco.

### B. The authorization for tracking the Mazda Protégé

#### 1) Facts included in the application

On January 11, 2012, pursuant to 18 U.S.C. § 3117 and Minn. Stat. § 626A.36, Deputy Fletcher filed an application, under seal, for the installation of a mobile tracking device on a black 2001 Mazda Protégé with Minnesota license plate number 610 BAU ("Mazda Protégé").

In the application, Deputy Fletcher explained that the Hennepin County Sheriff's Office Narcotics Unite was "conducting a criminal investigation of narcotics" and that based on his investigation, he believed the subjects of the investigation were using the Mazda Protégé "in furtherance of the controlled substance violations." (See Gov't Ex. 3). He believed that there

would likely be information obtained from the mobile tracking device that would be relevant to the ongoing criminal investigation his department was conducting.

Deputy Fletcher provided that for the six-month period prior to the application on January 11, 2012, he had been "conducting an on-going narcotics investigation into a group of Hispanic persons distributing large quantities of crystal methamphetamine and cocaine in the Twin Cities metro area." He further stated that he had been using a confidential informant (CI) to make controlled purchases of narcotics from the group and that police surveillance had shown the group conducting narcotics transactions and using vehicles as load cars to transport narcotics and large amounts of U.S. currency. On at least one occasion, Deputy Fletcher had interdicted a vehicle used by the group and seized more than $90,000 in U.S. currency.

Deputy Fletcher additionally explained that he had observed the Mazda Protégé parked at an address used by high ranking members of the group and that the "vehicle was purchased in November of 2011 from a local dealership by a white male with an extensive criminal history," which Deputy Fletcher believed was "given to the organization as compensation for a drug debt."

In the seventy-two hours prior to the application, Deputy Fletcher, during surveillance, "observed a member of the group drive the vehicle to the residence of another member of the group and leave it there after a lengthy meet with the other member." Based on other information from his investigation, he knew "both persons involved in this exchange [to be] persons responsible for coordinating shipments of narcotics and United States Currency in and out of the area."

In light of this information, Deputy Fletcher believed that if officers were permitted to monitor the activities of the Mazda Protégé, they would "be able to further identify locations

where members of [the] group may be storing narcotics, possibly identify [the] vehicle as a load vehicle for transporting narcotics and United States Currency and gain valuable information into the distribution network of [the] group."

Based upon this information, Minnesota District Court Judge Lynn Olson issued an order authorizing the installation of a mobile tracking device on the Mazda Protégé for a period no longer than 60 days.  Judge Olson found that "based upon the information submitted by the Applicant . . . there [was] reason to believe that the information likely to be obtained by the installation and use of the mobile tracking device [was] relevant to an ongoing investigation."

### 2) The tracking of the Mazda Protégé did not violate Defendant's Fourth Amendment rights

To challenge the lawfulness of a search under the Fourth Amendment, Defendant must first demonstrate that she had a reasonable expectation of privacy.  Rakas v. Illinois, 439 U.S. 128, 143 (1978) ("[C]apacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.").  "The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area or item searched."  United States v. Stallings, 28 F.3d 58, 60 (8th Cir. 1994) (quoting United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994)).  Defendant has not provided any information based upon which the Court could find that she had a reasonable expectation of privacy in the Mazda Protégé.  The application does not mention Defendant's name at all and there is no evidence in the record to suggest that Defendant was seen driving in, or riding in, the Mazda Protégé at any time, such that her movements specifically were tracked.  Based upon the record before the Court, the Court cannot find that Defendant had a reasonable expectation of privacy in the

Mazda Protégé such that her Fourth Amendment rights were violated.  See United States v.

Barraza-Maldonado, No. 12-CR-54 (PJS/SER), 2012 WL 2952312, *4 (D. Minn. Jul. 19, 2012)

(finding that the defendant did not have a reasonable expectation of privacy in a vehicle he "did

not own, possess, or have any type of property right" at the time the GPS device was installed).

### C.  The authorization for tracking the Chrysler Pacifica

#### 1)  Facts included in the application

On January 11, 2012, pursuant to 18 U.S.C. § 3117 and Minn. Stat. § 626A.36, Deputy

Fletcher filed an application, under seal, for the installation of a mobile tracking device on a gray

2005 Chrysler Pacifica with Minnesota license plate number 193 HGV ("Chrysler Pacifica").

In the application, Deputy Fletcher explained that the Hennepin County Sheriff's Office

Narcotics Unite was "conducting a criminal investigation of narcotics" and that based on his

investigation, he believed the subjects of the investigation were using the Chrysler Pacifica "in

furtherance of the controlled substance violations."  (See Gov't Ex. 3).  He believed that there

would likely be information obtained from the mobile tracking device that would be relevant to

the ongoing criminal investigation his department was conducting.

Deputy Fletcher provided that for the two-month period prior to the application made on

January 11, 2012, he had been conducting an on-going narcotics investigation into a person who

ha[d] been identified as Efrain Blanco" and who Deputy Fletcher believed to be involved in the

distribution of crystal methamphetamine.  Deputy Fletcher, while performing surveillance, had

observed Blanco driving several different vehicles, although he knew Blanco did not have a valid

driver's license.

Deputy Fletcher further explained that he had been utilizing a confidential informant (CI)

to make controlled purchases of narcotics from Blanco.  In the week before the application,

Deputy Fletcher learned from the CI that Blanco "was traveling in a gray Chrysler SUV with an unknown Hispanic female," and that, according to the CI, Blanco had "approximately a 1/4 lb. of crystal methamphetamine with him in the vehicle and was using the female to drive him because he did not have a license." The CI had also informed Deputy Fletcher that "Blanco was going to be using the female in his narcotics trafficking."

In the seventy-two hour period prior to the application, Deputy Fletcher, while performing surveillance at an address known to be used by Blanco, observed Blanco exiting out of the Chrysler Pacifica along with a Hispanic female.

Based upon this information, Minnesota District Court Judge Lynn Olson issued an order authorizing the installation of a mobile tracking device on the Chrysler Pacifica for a period no longer than 60 days. Judge Olson found that "based upon the information submitted by the Applicant . . . there [was] reason to believe that the information likely to be obtained by the installation and use of the mobile tracking device [was] relevant to an ongoing investigation."

### 2) Probable cause supports the order authorizing the installation of the mobile tracking device on the Chrysler Pacifica

At the hearing, the parties submitted the order authorizing the installation of a mobile tracking device and documents accompanying the order including the application in support thereof, without any argument, on the four corners of the documents for a determination of whether probable cause supported the order.[6] The Court finds that probable cause supports the order.

---

[6] In a recent opinion, the United States Supreme Court held that the installation of a GPS device on a person's vehicle and its use to monitor a person's movements constitutes a search. See United States v. Jones, --- U.S. ---, 132 S. Ct. 945, 949 (2012). Although 18 U.S.C. § 3117 and Minn. Stat. § 626A.36 only require a showing that the "information likely to be obtained by the installation and use of a mobile tracking device is relevant to an ongoing investigation," because the Court finds that probable cause supports the order issued in this case, and as such would satisfy any lower threshold showing, the Court limits its analysis to the issue presented by the parties; namely, whether probable cause existed.

As already explained above, "probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Colbert, 605 F.3d at 576 (quoting Gates, 462 U.S. at 231). "The existence of probable cause depends on whether, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Solomon, 432 F.3d at 827 (internal quotation marks omitted).

Here, Deputy Fletcher had information that Blanco was engaged in distributing crystal methamphetamine, cocaine, and marijuana. He had personally observed Blanco exiting the Chrysler Pacifica. Furthermore, Deputy Fletcher had received information from a reliable[7] confidential informant that Blanco was travelling in a gray Chrysler SUV with a Hispanic female and that on at least one occasion there was 1/2 lb. of crystal methamphetamine in the Chrysler Pacifica with Blanco and the female.

Because the police had information that Blanco was distributing crystal methamphetamine, cocaine, and marijuana, had seen Blanco in the Chrysler Pacifica, and because they had information from a reliable confidential informant that Blanco had transported 1/2 lb. of crystal methamphetamine in the vehicle in the past, the Court finds that there was probable cause to believe that the Chrysler Pacifica was being used in furtherance of criminal activity. See United States v. Williams, 534 F.3d 980, 984 (8th Cir. 2008) (explaining that

---

[7] "An informant's tip may be sufficiently reliable to support a probable-cause determination if the informant has previously provided reliable information **or** if the tip is corroborated by independent evidence." United States v. Leppert, 408 F.3d 1039, 1041 (8th Cir. 2005) (emphasis added). Here, the CI was used to make controlled purchases of narcotics and several of the facts provided by the CI were also corroborated by Deputy Fletcher; namely that Blanco travelled in a gray Chrysler SUV with a Hispanic female, that the female was the driver of the vehicle, and that Blanco did not have a valid driver's license. As such, based on the facts contained within this application alone, the Court finds the CI to be reliable. See United States v. Buchanan, 574 F.3d 554, 562 (8th Cir. 2009) (explaining that "[a]n informant may also be considered reliable if the information he or she supplies 'is at least partially corroborated' by other sources" and that "[e]ven the corroboration of minor, innocent details can suffice to establish probable cause"); United States v. Lucca, 377 F.3d 927, 933 (explaining that an "informant's track record of reliability [can be] established by successful controlled purchases").

"information from a confidential informant can be sufficient to establish probable cause . . ."); United States v. Pineda, 370 Fed. Appx. 60, 61 (11th Cir. 2010) (finding probable cause existed to search the defendant's vehicle when a confidential informant, who the police had previously used to make controlled purchases, advised the police that the defendant was selling methamphetamine and the vehicle might have weapons in it, particularly when other facts provided by the confidential informant were corroborated by the police); United States v. Wacker, 72 F.3d 1453, 1471 (10th Cir. 1995) (finding probable cause existed to believe the defendant's vehicle was being used to transport drugs based on a confidential informant's tip when the police corroborated some of the information provided by the informant); United States v. Steele, 353 Fed. Appx. 908, 910 (5th Cir. 2009) (finding probable cause existed to search the defendant's vehicle based on information provided by a first-time confidential informant based on the detail of information, real-time updated provided by the informant and the corroboration of certain facts by the police); United States v. Spires, 3 F.3d 1234, 1237 (9th Cir. 1993) (finding probable cause existed for a second search of a vehicle based on a tip from a confidential informant that drugs remained in the vehicle even after the first search had revealed some drugs); United States v. Terrero, 909 F. Supp 331, 333 (D. Md. 1995) (finding police had probable cause to believe the defendant possessed drugs on his person when a reliable confidential informant told the police that the defendant had drugs in his pants).

### D.  Defendant's **Miranda** rights were properly stated and translated to her

A defendant's waiver of her Miranda rights must be made voluntarily, knowingly, and intelligently.  Miranda v. Arizona, 384 U.S. 436, 444 (1966).  When determining whether a waiver was voluntarily, knowingly, and intelligently, the court must inquire whether:

> First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."

Second, the suspect must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).  "The government has the burden of proving the validity of the Miranda waiver by a preponderance of the evidence."  United States v. Haggard, 368 F.3d 1020, 1024 (8th Cir. 2004).

 As provided by Defendant at the hearing, the only challenge is whether the Miranda warning was properly translated such that the waiver was made knowingly—there is no dispute that the waiver was voluntary.  The Government argued that there was no error in the English version provided to Defendant at the time it was made and that there was no error in the translation of the Miranda warning at the time it was given.

The transcript, as well as the audio recording, of the conversation between Deputy Anthony Fletcher and Defendant provides the full statements of all parties (in either English or Spanish) as they were made at the time the Miranda warning was given to Defendant.  The statements made in Spanish in the recording and transcript, by both the interpreter and Defendant, at the time the Miranda warning was given have now been translated from Spanish into English by Federally Certified Spanish Court Interpreter, Marianne McEvoy.  (See Gov't Ex. 1A).

There is no dispute that the Miranda warning, as stated in English, was proper.  Deputy Fletcher read from a "Miranda card" and properly advised her of her Constitutional rights in English:

You have the right to remain silent. . . . Anything you say can and will be used against you in court. . . .  You have the right to talk to a lawyer now, and have the lawyer present now or at any time during questioning. . . . If you cannot a phone-

fford a lawyer, one will be appointed to you without cost. . . . Okay? Do you
understand each of these rights?

(Gov't Ex. 1A at 4-5). The question before the Court is merely whether the translation of the
Miranda warning, as stated by Deputy Fletcher in English, was properly translated by the
interpreter at the time of Defendant's interview.

"Although language barriers may inhibit a suspect's ability to knowingly and intelligently
waive [her] *Miranda* rights, when a defendant is advised of [her] rights in [her] native tongue
and claims to understand such rights, a valid waiver may be effectuated." United States v.
Hernandez, 913 F.2d 1506, 1510 (10th Cir. 1990). "The translation of a suspect's *Miranda*
rights need not be a perfect one, so long as the defendant understands that [s]he does not need to
speak to police and that any statement [s]he makes may be used against [her]." Id. "[W]arnings
that convey the **substance** of the suspect's rights are sufficient." United States v. Hernandez, 93
F.3d 1493, 1502 (10th Cir. 1996) (emphasis added). "That the interpreter's recitation of the
*Miranda* rights was not a precise or exact translation does not necessarily render the waiver
invalid." United States v. Robles, 313 F. Supp.2d 1206, 1221 (D. Utah 2004).

The Eighth Circuit has explained that "there are no magic words that automatically
satisfy *Miranda's* constitutional concerns." Thai v. Mapes, 412 F.3d 970, 977 (8th Cir. 2005)
(citing Missouri v. Seibert, 542 U.S. 600, (2004)). "[T]he appropriate inquiry is whether the
warning that [the defendant] received reasonably conveyed [her] constitutional rights as required
by *Miranda*." Id. "[W]aiver is not a question of form, but of substance." Id.

Here, the translations made by the interpreter during the interview with Deputy Fletcher
have been translated back into English by a Federally Certified Spanish Court Interpreter,
Marianne McEvoy. The translation by Ms. McEvoy demonstrates that the original translation by
the interpreter during the interview were almost all exactly verbatim as what Deputy Fletcher had

said in English.  Defendant has not challenged any specific translated words and there were only four statements, with respect to the <u>Miranda</u> warning, that were translated somewhat differently from what Deputy Fletcher said in English.

First, Deputy Fletcher's statement "The Constitution requires I inform you that . . ." was translated (according to Ms. McEvoy) as "The Constitution req-requires that I inform you of this."  The use words "of this" instead of "that" had no bearing on the meaning or context of the statement whatsoever and the Court finds that the very slight deviation in the translation was entirely inconsequential in terms of substance.

Second, Deputy Fletcher's statement "You have the right to talk to a lawyer now, and have the lawyer present now or at any time during questioning" was translated as "You have the right to have a lawyer present, or to have him present with you during the interview."  (Gov't Ex. 1A at 4).  As to the second part of the sentence, although the translation did not specifically include the word "now," it did specifically mention "the interview."  In the absence of any discussion that there would be another interview at any point, any reasonable person would have understood that she had the right to have the attorney present now during that specific interview. As to the first part of the sentence, although the translation did not specifically state that she had the right to talk to a lawyer, the translation clearly advised her that she had the right to have an attorney present, which necessarily implies that she would be able to speak with him, or at the very least have the benefit of his counsel.  As such, because a translation need not be perfect, the Court finds that the translation of this statement does not present any Constitutional issue upon which the Court could find that Defendant did not waive her rights knowingly.  The translation of Deputy Fletcher's statement was sufficient to inform Defendant of the substance and context of her right to have an attorney present during any questioning.

Third, Deputy Fletcher's statement "If you cannot a phone—ford a lawyer, one will be appointed to you without cost" was translated as "If you cannot afford a lawyer, one can be given to you without payment." As in the first statement at issue, neither the substitution of "given" for "appointed" nor the substitution of "payment" for "cost" is of consequence to Defendant's waiver.

Finally, Deputy Fletcher's statement "Okay? Do you understand each of these rights?" was translated as "You, do you understand those rights?" Again, the substance and context of the translation was the same as the statement made by Deputy Fletcher in English. As such, the Court finds that it had no Constitutional bearing on Defendant's waiver.

After all of the Miranda warnings had been provided to her, Defendant stated that she understood the rights she had been read and that she still wished to talk with Deputy Fletcher. "*Miranda* itself stated that admissibility of any statement given during custodial interrogation of a suspect depends on whether the police provided the suspect with four warnings: "the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." United States v. Perez-Lopez, 348 F.3d 839, 848 (9th Cir. 2003); Hernandez, 93 F.3d at 1502. Here, the translation during the interview was advised Defendant of all of these rights.

For the reasons stated above, the Court finds that Defendant's waiver of her Miranda rights was made voluntarily, knowingly, and intelligently and recommends that Defendant's motion to suppress any statements she made be denied.

III.     **CONCLUSION**

1.          Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that Defendant's motions to suppress

[Docket Nos. 33 and 35] be denied.


Dated: December 10, 2012                        s/Leo I. Brisbois_____

                                                        LEO I. BRISBOIS

                                                        United States Magistrate Judge

## N O T I C E

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by December 24, 2012**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within fourteen days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.